491 S.E.2d 275

The STATE, Respondent,

v.

**Marcus JOSEPH, Appellant.**

**No. 2711.**

Court of Appeals of South Carolina.

Submitted Oct. 8, 1996

Decided Aug. 18, 1997.

Rehearing Denied Sept. 18, 1997.

---

354

Assistant Appellant Defender Robert M. Dudek, of the South Carolina Office of Appellate Defense, Columbia, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport; and Solicitor Warren B. Giese, Columbia, for respondent.

HOWELL, Chief Judge:

Marcus Joseph, an inmate at Kirkland Correctional Institute, was convicted of possession of contraband and sentenced to three years imprisonment, consecutive to his current life sentence. Joseph appeals, asserting that the trial court committed reversible error in connection with several evidentiary rulings. We affirm in part, reverse in part, and remand for a new trial.

I.

At approximately 12:30 p.m. on July 19, 1993, Kirkland Correctional officers Donald Ruger and Keith Hardy were making security checks of the prison yard when they observed inmates approaching Joseph and lingering for short periods of time and Joseph reaching in and out of his pocket. According to the officers, Joseph appeared to be looking out for the correctional officers and was acting "strange, you know, jittery, nervous." Based on these observations, the officers took Joseph to an officers' rest room for a routine shakedown. The officers performed a strip search of Joseph, but found nothing. However, as Joseph was dressing, Ruger noticed a piece of cellophane sticking out of one of the dreadlocks in Joseph's hair. After searching Joseph's cell for contraband, the officers then informed Joseph that they were going to search his

hair. Joseph objected, stating that searching his hair violated his religious beliefs.

Officers Ruger and Hardy took Joseph to the "shakedown room" so that the search could be done in the presence of their supervisor, Sergeant McKinzie. Ruger and Hardy began searching Joseph's hair, and Ruger removed two cellophane packages, one containing separate packets of a green leafy substance, and the other containing separate packets of a beige rock-like substance. Ruger filled out a chain of custody form and turned the packages over to Investigator Davis, Kirkland's contraband officer. Davis immediately field tested the substances in the packages, which tested positive for crack cocaine and marijuana. He found weights of 0.07 grams of crack cocaine and 0.54 grams of marijuana. Davis sealed the evidence in a plastic bag and personally delivered the bag to SLED on August 27, 1993, placing the evidence in the drug box. On April 18, 1994, Davis received the evidence back from SLED. He stored the evidence in a locked file cabinet in his contraband office from that time until January 5, 1995, at which point he delivered the evidence back to SLED for retesting.

On September 1, 1993, Susan Kilmer, a SLED chemist, retrieved the evidence from the drop box. Between September 25 and October 4, 1993, she analyzed the evidence, finding 0.43 grams of marijuana and 0.07 grams of crack cocaine. She then secured the evidence in her locker at SLED until March 24, 1994, when she turned it over to Susan Wilson, an evidence control employee at SLED.

On April 18, 1994, Connie McKay, another SLED employee, retrieved the evidence from the evidence vault and returned it to Officer Davis. On January 5, 1995, Davis resubmitted the evidence to SLED, placing it in a secured drug box. Chemist Kimberly Thigpen reanalyzed the evidence, finding 0.41 grams of marijuana and 0.07 grams of crack cocaine.

Prior to trial, the State informed the trial court that Susan Kilmer, the chemist who first analyzed the evidence, would not testify because she had moved to Michigan and was beyond the reach of the State's subpoena power. Joseph objected, arguing that Rule 6 of the South Carolina Rules of Criminal Procedure required the State to produce Kilmer. In addition,

Joseph argued that cross-examination of Kilmer was necessary to highlight deficiencies in the State's chain of custody. The State explained that, in lieu of Kilmer's testimony, it intended to offer an affidavit from Kilmer explaining her handling of the evidence and stating that she relinquished the evidence in substantially the same condition as when she received it. The trial court overruled Joseph's objection, ruling that the absence of Kilmer was not fatal to the chain of custody.

At trial, Joseph renewed his objection to Kilmer's absence and additionally argued that the State failed to establish an adequate chain of custody. The trial court again overruled Joseph's objections.

The defense's theory of the case was that Joseph had been set up by Officers Ruger and Hardy. Joseph attempted to show that the officers were friends of two other guards who had been terminated shortly before Joseph's arrest as a result of an investigation in which Joseph provided information. At trial, Joseph sought to impeach Ruger's credibility as a witness by introducing during cross-examination evidence of Ruger's 1992 conviction for giving false information to police officers, as well as evidence of Ruger's 1992 entry into and successful completion of the Pretrial Intervention (PTI) program for a charge of possession of crack cocaine. The trial court allowed into evidence Ruger's conviction for giving false information, but ruled that Ruger's participation in the PTI program did not amount to a conviction and was therefore inadmissible.

## II.

On appeal, Joseph first challenges the trial court's rulings in connection with his attempts to impeach the credibility of Officer Ruger.

## A.

Joseph contends the trial court erred by refusing to allow him to impeach Ruger with his prior possession of crack cocaine. We find no error.

As noted above, Ruger's charge of possession of crack cocaine was disposed of through his successful completion of the PTI program. The Pretrial Intervention Act (the Act), S.C.Code Ann. § 17–22–10 through –170 (1985 & Supp.1996), establishes an alternative, noncriminal method for disposition of certain charges in cases where "there is substantial likelihood that justice will be served if the offender is placed in an intervention program [and] it is determined that the needs of the offender and the State can better be met outside the traditional criminal justice process." S.C.Code Ann. § 17–22–60(1) & (2) (Supp.1996). To participate in the PTI program, the offender must satisfy certain statutory requirements, *see* S.C.Code Ann. § 17–22–50 through –70 (Supp.1996), and must agree, among other things, to the terms and conditions of the intervention program established by the solicitor. S.C.Code Ann. § 17–22–90(3) (Supp.1996). Upon successful completion of the intervention program, the solicitor "shall effect a noncriminal disposition of the charge or charges pending against the offender." S.C.Code Ann. § 17–22–150(a) (Supp.1996).

When a witness takes the stand, he may be impeached by the introduction into evidence of convictions for crimes of moral turpitude. *See, e.g., Horton v. State,* 306 S.C. 252, 411 S.E.2d 223 (1991); *State v. Major,* 301 S.C. 181, 391 S.E.2d 235 (1990). In South Carolina, possession of cocaine is considered a crime of moral turpitude. *Major,* 301 S.C. at 184, 391 S.E.2d at 237 (holding that possession of cocaine is a crime of moral turpitude). However, given that successful completion of the PTI program results in a noncriminal disposition of the charges against the offender, participation in the PTI program cannot be considered a conviction for purposes of impeaching a witness. *See* 1990 Op. S.C. Att'y Gen. No. 90–51 (successful completion of the PTI program does not amount to a conviction); *accord* 1988 Op. S.C. Att'y Gen. No. 88–77.

A more difficult question, however, is whether successful completion of the PTI program prohibits impeachment of the witness with the *conduct* giving rise to the PTI involvement. A witness may be impeached with prior bad acts not the subject of conviction that affect his credibility. "The cross-examiner must take the [witness's] answer concerning these alleged acts, however, and if the [witness] denies them,

he may not be contradicted." *Major*, 301 S.C. at 184, 391 S.E.2d at 237; *accord State v. China*, 312 S.C. 335, 440 S.E.2d 382 (Ct.App.1993). The cross-examiner must have a good faith factual basis before questioning a witness about his past conduct. *See State v. Gunn*, 313 S.C. 124, 137, 437 S.E.2d 75, 82 (1993), *cert. denied*, 510 U.S. 1115, 114 S.Ct. 1063, 127 L.Ed.2d 383 (1994); *State v. McGuire*, 272 S.C. 547, 550, 253 S.E.2d 103, 104 (1979).

Upon successful completion of the intervention program, the offender may apply for a court order directing the destruction of the official records relating to his arrest. S.C.Code Ann. § 17–22–150(a) (Supp.1996). The effect of the order is

to restore the person, in the contemplation of the law, to the status he occupied before the arrest. No person as to whom the order has been entered may be held thereafter under any provision of any law to be guilty of perjury or otherwise giving a false statement by reason of his failure to recite or acknowledge the arrest in response to any inquiry made of him for any purpose.

*Id.* Therefore, upon successful completion of the PTI program, it is as if the arrest never occurred—the offender is not required to admit to the arrest and the offender's denial of the arrest is, by statute, deemed to be truthful. It seems clear, then, that it would be error for a court to allow cross-examination about an arrest disposed of through successful completion of the PTI program.

The Act, however, does not extend the same protection to the *conduct* giving rise to the arrest. That is, while the Act provides that the offender may deny that he was arrested, it does not provide that he may deny the conduct leading up to the arrest. Assuming that the conduct could otherwise be used to impeach the witness, the question is whether the witness's successful completion of the PTI program places the conduct off-limits for purposes of impeachment.

The Act's provisions for expungement and confidentiality of the arrest reflect a legislative policy decision that, under certain circumstances, the interests of justice require that an offender be given a fresh start, free from the stigma of a criminal conviction. To protect the arrest but not the conduct from inquiry for impeachment purposes may be inconsistent

with the policies underlying the Act. Moreover, given that the Act eliminates the existence of the arrest, it could be argued that the Act effectively prevents any question about the underlying conduct from having a factual basis, particularly if the only basis for the cross-examiner's knowledge of the conduct comes through knowledge of the arrest. Thus, it may well be that conduct ultimately resulting in successful completion of the PTI program and expungement of the records should not be used to impeach a witness.

However, to keep the underlying conduct off-limits for impeachment purposes may well exceed the intended scope of the Act. The Act specifically protects only the arrest, and makes no mention of the underlying conduct. Had the legislature intended to protect the conduct, the Act would have made that protection explicit. Moreover, the fact remains that, participation in the PTI program notwithstanding, the witness did in fact commit the bad act. If the act affects the witness's credibility, it would be unfair to prevent a party from using the act to impeach the witness. Allowing impeachment through a carefully worded question about the underlying conduct, but not the arrest, would ensure that all litigants are able to present all relevant information to the jury. Moreover, such an approach would leave in place the Act's protection against the stigma of a criminal conviction, given that the offender could still deny, whether on the witness stand or on an employment application, that he was ever arrested or convicted.

Nonetheless, we cannot resolve this question today. At trial, Joseph sought to impeach Ruger only with the crack cocaine arrest. He did not argue, as he does on appeal, that Ruger's possession of crack cocaine, without regard to the PTI disposition, was a prior bad act for which Ruger was subject to impeachment. The issue, therefore, is not preserved for appeal, and we cannot address it. *See, e.g., State v. Bailey,* 298 S.C. 1, 377 S.E.2d 581 (1989) (A party cannot argue one ground below and then argue another ground on appeal.).

## B.

Joseph also contends that the trial court erred by allowing Ruger to explain the circumstances surrounding his

conviction for giving false information to the police. We agree.

As mentioned above, Joseph was allowed on cross-examination to impeach Ruger with the conviction for giving false information to a police officer. On redirect, the State asked Ruger to "expand upon the false conviction." Over defense counsel's objection, Ruger stated as follows:

> I was fooling around one night and give a female my jeep. She didn't come back on time. So, I reported it stolen. Okay. At that particular time, I didn't want my wife to find out, right. So, I told the policeman that it was stolen and then later I had to come back and tell him that it wasn't stolen. So, that's basically the bottom line of it.

A witness may be impeached by evidence of prior convictions for crimes of moral turpitude.[1] *See, e.g., State v. Outlaw,* 307 S.C. 177, 179, 414 S.E.2d 147, 148 (1992); *State v. Sarvis,* 317 S.C. 102, 105, 450 S.E.2d 606, 608 (1994), *cert. denied* (May 18, 1994).[2] However, the details of the crime of which the witness has been convicted, whether the details could be considered mitigating or aggravating, are not admissible; the witness has "already been afforded [the] opportunity to defend himself against that charge and his [conviction] is conclusive." *State v. Gregg,* 230 S.C. 222, 225, 95 S.E.2d 255, 257 (1956); *accord State v. Corn,* 215 S.C. 166, 172–73, 54 S.E.2d 559, 561 (1949). Accordingly, the trial court erred by

---

1. The State does not contend that providing false information to the police is not a crime of moral turpitude. *See, e.g., State v. Ball,* 292 S.C. 71, 354 S.E.2d 906 (1987) (Crimes of moral turpitude involve acts of "baseness, vileness or depravity in the private and social duties which man owes to his fellow man or to society in general, contrary to the customary and accepted rule of right and duty between man and man."), *overruled in part on other grounds, State v. Major,* 301 S.C. 181, 391 S.E.2d 235 (1990).

2. The South Carolina Rules of Evidence modify this rule and provide that a witness other than the defendant may be impeached by evidence of a crime "if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted," Rule 609(a)(1), SCRE, or if the crime involved dishonesty or false statement, regardless of the punishment. Rule 609(a)(2), SCRE. However, Joseph was tried in January 1995, before the effective date of the Rules of Evidence. *See* Rule 1103(b), SCRE (Rules effective September 3, 1995).

allowing the State to elicit the details of the conviction from Ruger.

The State, however, contends any error in allowing Ruger to explain his conviction was harmless. *See, e.g., State v. Mitchell,* 286 S.C. 572, 336 S.E.2d 150 (1985) (errors are harmless where they could not reasonably have affected the result of the trial); *State v. Knight,* 258 S.C. 452, 189 S.E.2d 1 (1972) (conviction will not be reversed for nonprejudicial error in the admission of evidence). We disagree.

The State first argues that Ruger's explanation was not "mitigating," but instead further impeached his credibility. According to the State, Ruger's "admission of dishonesty to hide his own adulterous relationship with another woman further diminished his character in the eyes of the jury." Preliminarily, we note that Ruger's explanation does not necessarily amount to an admission that he committed adultery. Nonetheless, whether or not the jury understood the explanation as an admission of adultery, we conclude that Ruger's explanation, which allowed the jury to see that his conduct may not have negatively affected anyone other than himself, served to diminish the severity of his crime, and thus, to some extent, rehabilitate Ruger in the jury's eyes.

Moreover, while Officer Ruger's testimony was, in some respects, cumulative to that of the other officers, it cannot be ignored that Joseph alleged and sought to prove a conspiracy involving Officers Ruger and Hardy, who, according to Joseph, were engaged in a plot of retribution against him because he informed on two of their fellow officers. To support his defense, Joseph presented evidence that he had furnished an affidavit implicating the two officers in a theft of drugs and money from an inmate, and that his information ultimately led to the dismissal of the officers. Joseph also presented testimony showing that Ruger and Hardy were friends of the two dismissed officers. While the testimony of all the officers was important to the prosecution's case, the testimony of Ruger was essential, because it was Ruger who seized the drugs and maintained custody of them until they were turned over to the evidence custodian. Therefore, in view of Ruger's dual status as the prosecution's chief witness and the main focus of Joseph's defense, we cannot conclude that Ruger's improper

explanation of his conviction was harmless. *See McGuire,* 272 S.C. at 550, 253 S.E.2d at 104 (reversing a conviction and remanding for a new trial where, among other things, the trial court erred by refusing to allow the defendant to impeach the credibility of a witness critical to the State's case); *Mitchell,* 286 S.C. at 573, 336 S.E.2d at 151 ("[T]he materiality and prejudicial character of the error must be determined from its relationship to the entire case."); *cf. State v. Holmes,* 320 S.C. 259, 264–65, 464 S.E.2d 334, 337 (1995) (Whether improper exclusion of impeachment evidence was prejudicial and requires reversal depends on "the importance of the witness'[s] testimony to the prosecution's case, whether the testimony was cumulative, whether other evidence corroborates or contradicts the witness'[s] testimony, the extent of the cross-examination otherwise permitted, and the overall strength of the State's case."), *cert. denied,* —— U.S. ——, 116 S.Ct. 2507, 135 L.Ed.2d 197 (1996).

## III.

■ Finally, Joseph contends the trial court erred by admitting the marijuana and crack cocaine evidence because of defects in the chain of custody. We agree.

The South Carolina Rules of Criminal Procedure provide that, under certain conditions, a report signed by a chemist or analyst is admissible to establish that the "material. is or contains the substance or substances stated.... without the necessity of the chemist or analyst personally being present or appearing in court." Rule 6(a), SCRCrimP. The rule further provides that

> [t]he defendant or opposing party may object to the introduction of a chemist's or analyst's report at a preliminary hearing, or if no preliminary hearing is held, not later than ten (10) days prior to the trial of the case. If such objection is properly made, the trial judge *shall* require the chemist or analyst to be present at trial for the purpose of personally testifying.

Rule 6(a)(2)(C), SCRCrimP (emphasis added). The State concedes that Joseph objected to the use at trial of Kilmer's report as required by Rule 6(a)(2)(C).

■ Rule 6(a)(2)(C) provides that the trial court "shall" require the presence of the chemist upon proper objection by the defendant. Given the nature and purpose of this provision of the rule, it is inescapable that the trial court's duty to require the presence of the chemist upon proper objection is mandatory, not permissive. *See State v. Blair,* 275 S.C. 529, 533, 273 S.E.2d 536, 538 (1981) (While the word "shall" may sometimes be construed as permissive, "a statutory provision is generally regarded as mandatory where the power or duty to which it relates is for the security or protection of private rights."). Accordingly, we conclude that the admission of Kilmer's report over Joseph's timely objection violated Rule 6.

This Rule 6 violation, however, does not necessarily mean that the trial court erred by admitting the drug evidence. Rule 6 does not supplant the general law governing chain of custody requirements. Instead, Rule 6 simply provides an alternate means of establishing a chain of custody by authorizing, under proper circumstances, the admission of reports and affidavits in lieu of live testimony. Where, as here, the requirements of Rule 6 are not met, the question is whether, without considering any affidavit or report admitted in violation of Rule 6, the general chain of custody requirements have been met.

■ A party offering into evidence fungible items such as drugs or blood samples must establish a chain of custody as far as practicable. *See, e.g., State v. Cribb,* 310 S.C. 518, 426 S.E.2d 306 (1992); *Benton v. Pellum,* 232 S.C. 26, 100 S.E.2d 534 (1957); *State v. Johnson,* 318 S.C. 194, 456 S.E.2d 442 (Ct.App.1995), *cert. denied* (December 8, 1995). Where the analyzed substance has passed through several hands, the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and analysis. While the proof of chain of custody need not negate all possibility of tampering, it must establish a complete chain of evidence *as far as practicable. State v. Williams,* 297 S.C. 290, 376 S.E.2d 773 (1989); *Johnson,* 318 S.C. at 196, 456 S.E.2d at 443.

In the case at bar, we conclude that the State failed to establish an adequate chain of custody. Kilmer was the critical link in the State's chain of custody—it was Kilmer who retrieved the evidence from the drop box and first analyzed

the evidence, and it was Kilmer who retained possession of evidence for six months. The fact that Kilmer had moved to Michigan does not render Kilmer unavailable or make it impracticable for the State to produce her for trial once Joseph objected to the use of her affidavit. Given Kilmer's importance in the chain of custody and the inconsistencies in the State's proof of the chain of custody,[3] Joseph's right to cross-examine Kilmer cannot be abridged simply because she no longer lived in South Carolina. We therefore conclude that the State's evidence of the chain of custody was fatally deficient and that the trial court erred by admitting the drug evidence.[4]

## IV.

In summary, we conclude the trial court properly prevented Joseph from impeaching Officer Ruger with charges that were disposed of after Ruger's successful completion of the Pretrial Intervention Program. However, we conclude that the trial

---

3. In his arguments to the Court, Joseph identified many problems and inconsistencies with the State's chain of custody. For example, Kilmer's affidavit states that she prepared a report on her analysis of the evidence on October 4, 1993, while the report provided to Joseph was dated October 6, 1993. In addition, the seized marijuana was weighed at .54 grams by Officer Davis, but Kilmer determined that the marijuana weighed .43 grams and Thigpen determined that the marijuana weighed .41 grams. Conversely, despite the fact that a portion of the drugs are consumed during testing, the crack cocaine when seized weighed 0.07 grams, and, after being field tested by Officer Davis and twice analyzed by SLED, still weighed 0.07 grams. According to Joseph, these problems raised the question of whether the evidence tested by SLED was in fact the same evidence seized from Joseph.

4. The State's argument that the testimony and reports of the SLED officials was not required because Joseph was charged with possession of contraband under S.C.Code Ann. § 24-3-950 (1976) rather than with possession of marijuana and cocaine is manifestly without merit. The "contraband" that Joseph was charged with possessing was marijuana and cocaine; thus, in order to establish that Joseph possessed contraband, the State was required to establish that the seized items were in fact marijuana and cocaine. Moreover, the trial court submitted to the jury charges of possession of marijuana and possession of crack cocaine as lesser included offenses of the possession of contraband charges. Finally, contrary to the State's suggestion, the field testing of the evidence by Officer Davis was insufficient to establish the content of the evidence; thus, Davis's testimony did not render the SLED evidence cumulative and unnecessary.

court erred by allowing Ruger to explain the details surrounding his conviction for giving false information to the police. Finally, we conclude that, because the evidence of the chain of custody was inadequate, the trial court erred by admitting the marijuana and crack cocaine evidence. Accordingly, we hereby reverse Joseph's conviction and remand for a new trial.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

HOWARD, J., concurs.

HUFF, J., dissents in a separate opinion.

HUFF, Judge, dissenting:

I respectfully dissent and would affirm appellant's conviction. While I concur in part with the majority's opinion, I disagree with the majority's conclusion on the admission of evidence regarding details of witness Ruger's conviction for giving false information to the police. I further disagree with the majority's analysis of the chain of custody issue.

## LAW/ANALYSIS

### A. EXPLANATION OF IMPEACHING EVIDENCE

The majority concludes the trial judge erred in allowing Officer Ruger to explain his conviction for providing false information to the police. I disagree. The record shows, on cross examination, counsel for appellant was allowed to impeach Ruger with a 1992 conviction for giving false information to a police officer. The State asked Ruger on redirect to "expand upon the false information to police conviction." Over the objection of defense counsel, Ruger stated:

> I was fooling around one night and give a female my jeep. She didn't come back on time. So, I reported it stolen. Okay. At that particular time, I didn't want my wife to find out, right. So, I told the policeman that it was stolen and then later I had to come back and tell him that it wasn't stolen. So, that's basically the bottom line of it.

The majority cites *State v. Gregg*, 230 S.C. 222, 95 S.E.2d 255 (1956) and *State v. Corn*, 215 S.C. 166, 54 S.E.2d 559 (1949) for the proposition that any details of a crime of which a

witness has been convicted are not admissible, whether the details be mitigating or aggravating. I disagree.

In *State v. Gregg*, our Supreme Court found that the defendant, after being impeached by a prior conviction, was not entitled to testify to mitigating details of the crime. I disagree with the majority's assertion that this testimony diminished the severity of Ruger's crime. The clear implication from the testimony that he did not want his wife to find out another female had his car was that he was carrying on an illicit relationship with the female. Further, even if this testimony does not amount to an admission of adultery, it clearly affects the credibility of the witness, showing he was deceitful with his own wife. At any rate, Ruger's "explanation" of the details as to his crime in no way mitigated the seriousness of his conduct. If anything, the testimony reinforced that Ruger's credibility was questionable. Therefore, *State v. Gregg* is not controlling.

In *State v. Corn*, the Supreme Court found it was improper for the State to pursue further evidence relating to the defendant's prior convictions by eliciting evidence on the sentences imposed, revocation of parole, and a dishonorable discharge from the Army. The court stated, "It was permissible for the prosecution to show that the appellant had been convicted of crimes which would affect his credibility as a witness, but not his reputation for violence or other crimes not affecting his credibility. The length of the sentences imposed could not be said to affect his credibility." *State v. Corn* thus prohibits the introduction of evidence of prior bad acts or convictions which do not affect the witness' credibility. Here, the State did not elicit further evidence of a crime which was prejudicial to the appellant. While the evidence elicited by the State may have been categorized as "aggravating," such evidence only prejudiced the State's own witness.

The facts of this case are clearly distinguishable from *Gregg* and *Corn*. This is not a situation, as in *Gregg*, where the defendant is offering evidence to mitigate the seriousness of his conduct, thereby rehabilitating his credibility. Neither is this a situation, as in *Corn*, where the State is attempting to elicit testimony of aggravating circumstances to prejudice the defendant's credibility. Here, the testimony offered by the

State is, at the most, harmless to the defendant, and at the very least, further impeaches the State's witness. Therefore, its admission would not be prejudicial to the appellant.

A trial judge has considerable latitude in ruling on the admissibility of evidence and his rulings will not be disturbed absent a showing of probable prejudice. *State v. Sims,* 304 S.C. 409, 405 S.E.2d 377 (1991). The burden is upon the appellant to satisfy this court that there was prejudicial error in the admission of the testimony. *State v. McElveen,* 280 S.C. 325, 313 S.E.2d 298 (1984). In order to constitute reversible error, the reviewing court must be satisfied that there are reasonable grounds for supposing that the jury might have been misled to the prejudice of the appellant. *State v. Smith,* 230 S.C. 164, 94 S.E.2d 886 (1956). I conclude there was no prejudice to the appellant by the admission of this evidence.

## B.   CHAIN OF CUSTODY

The majority also finds error in the admission of the marijuana and crack cocaine into evidence based on defects in the chain of custody. The majority finds chemist Kilmer's absence to be fatal to the State's showing of proper chain of custody. I disagree.

Rule 6, SCRCrimP provides in pertinent part:

(a) Report of Chemical Analysis. For the purpose of establishing the physical evidence of a controlled substance ... a report signed by the chemist or analyst who performed the test or tests required concerning its nature shall be evidence that the material delivered to him or her was properly tested under procedures approved by the State Law Enforcement Division (SLED), that those procedures are legally reliable and that the material is or contains the substance or substances stated. The report shall be admitted without the necessity of the chemist or analyst personally being present or appearing in court provided:

\*     \*     \*     \*     \*     \*

(2) the report is accompanied by an affidavit of the chemist or analyst who performed the test. . . .

The defendant or opposing party may object to the introduction of a chemist's or analyst's report.... If such objection is properly made, the trial judge shall require the chemist or analyst to be present at trial for the purpose of personally testifying.

(b) Certified or Sworn Statement. For the purpose of establishing a chain of physical custody or control of evidence entered under Part A of this Rule, a certified or sworn statement signed by each successive person having custody of the evidence that he or she delivered it to the person stated is evidence that the person had custody and made delivery as stated without the necessity of the person who signed the statement being present in court provided: (1) the statement contains a sufficient description of the substance or its container to distinguish it; and (2) the statement says the substance was delivered in substantially the same condition as when received.

The defendant or his attorney may demand appearance in court of the persons within the chain of custody in the same manner as provided in Section (a).

The majority notes a violation of Rule 6 does not necessarily require the exclusion of drug evidence. However, the majority concludes Kilmer was a critical link in the chain because it was Kilmer who retrieved the evidence from the drop box and first analyzed it, and Kilmer who retained possession for a period of six months. I disagree.

The admission of evidence is in the sound discretion of the trial judge whose decision will not be overturned absent an error of law resulting in undue prejudice. *State v. Johnson,* 318 S.C. 194, 456 S.E.2d 442 (Ct.App.1995), *cert. denied* (December 8, 1995). Because evidence involving drugs may easily be tampered with, the party offering the drugs into evidence must establish a chain of custody as far as practicable; however, the proof of the chain of custody need not negate all possibility of tampering. *Id.* Instead, where the substance analyzed has passed through several hands, the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and analysis. *Id.* The party offering evidence must trace possession of the substance and what was done with it from the time it was taken until final

analysis. *State v. Singleton,* 319 S.C. 312, 460 S.E.2d 573 (1995).

In the case at hand, the State did not have to rely on the analysis of Kilmer to establish the drug properties of the substances found on appellant. While the State did have the substances reanalyzed by another SLED chemist after Kilmer's departure, the record shows the substances had already field tested positive for marijuana and crack cocaine prior to the drugs coming into the possession of Kilmer or anyone else at SLED.[1] Because appellant was charged with possession of contraband, the weights of the drugs were immaterial. The evidence of record does not leave to conjecture as to who had the substances and what was done with them between taking the drugs from appellant and the analysis by Davis. Accordingly, I would find Kilmer's presence was not necessary to establish the chain of custody. Further, any discrepancy in testimony concerning the weight of the drugs reflected upon the credibility of the evidence and not its admissibility.

## C. DENIAL OF IMPEACHING EVIDENCE

I would further note that I concur with the majority's affirmance of the issue of impeachment of Ruger with the crack cocaine evidence. However, I would affirm this issue on the ground that any error in the exclusion of such evidence was harmless.

The question of admission or exclusion of evidence is largely within the discretion of the trial judge and his exercise of such discretion will not be disturbed in the absence of an abuse thereof amounting to an error of law. *State v. Smicklevich,* 268 S.C. 411, 234 S.E.2d 230 (1977). The factors to be considered in determining whether exclusion of evidence of a witness's credibility constitutes harmless error include: (1) the importance of the witness's testimony to the prosecution's case; (2) whether the testimony was cumulative; (3) whether

---

1. I disagree with the majority's assertion that Officer Davis's field testing of the substances was insufficient to establish the content of the evidence. The fact that it was field tested goes to the weight of the evidence, not its admissibility. I further discern no significance in the fact that the judge submitted charges of possession of marijuana and possession of crack cocaine as lesser included offenses.

other evidence corroborates or contradicts the witness's testimony; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the State's case. *State v. Holmes*, 320 S.C. 259, 464 S.E.2d 334 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2507, 135 L.Ed.2d 197 (1996). Generally, where evidence is merely cumulative to other evidence admitted at trial, the exclusion of such evidence is not an abuse of discretion. *See State v. Jones*, 298 S.C. 118, 378 S.E.2d 594 (1989) (no abuse of discretion in denial of admission of photograph where photo was cumulative to other photographs admitted into evidence). The record before us clearly reflects the testimony given by Ruger was cumulative to and corroborative of testimony elicited from three other officers involved in the incident. Further, Ruger was effectively impeached by evidence of his conviction of giving false information to police. Finally, the overall strength of the State's case against appellant was very strong. Any possible error in the exclusion of the PTI evidence was therefore harmless.

For the foregoing reasons, I would affirm appellant's conviction.